UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID PEELER,

       Plaintiff,

v.                       Case No. 8:12-cv-1584-T-33TGW

KVH INDUSTRIES, INC.,

       Defendant.

_____/

**<u>ORDER</u>**

This cause comes before the Court in consideration of Defendant KVH Industries, Inc.'s Dispositive Motion for Summary Judgment (Doc. # 29), filed on June 6, 2013, to which Plaintiff filed a response in opposition (Doc. # 37) on June 20, 2013. KVH filed a reply (Doc. # 47), with leave of Court, on July 5, 2013. Also before the Court are Plaintiff David Peeler's Motion for Summary Judgment (Doc. # 34) and Motion for Adverse Inference (Doc. # 33), both filed on June 7, 2013. KVH filed responses in opposition to both Motions (Doc. ## 38, 39) on June 24, 2013, and Peeler filed a reply to KVH's response to the Motion for Summary Judgment, with leave of Court, on July 5, 2013 (Doc. # 46). In this Order, the Court will additionally address Peeler's Motion to Strike Defendant's Documents

Filed in Support of Motion for Summary Judgment (Doc. # 36), to which KVH responded on June 25, 2013 (Doc. # 41). For the reasons that follow, the Court denies Peeler's Motion for Adverse Inference, grants in part Peeler's Motion to Strike, and denies both Motions for Summary Judgment.

## I.   **Background**

KVH Industries designs and manufactures satellite communication systems for mobile users on moving platforms such as boats, buses, and motor homes. (Palmer Dep. Doc. # 31-1 at 4). On January 29, 2003, Peeler entered into a Manufacturer's Representative Agreement with KVH, by which KVH engaged Peeler as a technical trainer and independent contractor. (Agreement Doc. # 32-2 at 2). As a technical trainer, Peeler was responsible for visiting various distributors who bought products from KVH and educating the distributors' employees on the process of installing, operating, and repairing KVH products. (Peeler Dep. Doc. # 30-1 at 13).

The Agreement provided that KVH would pay Peeler "on all technical training performed in the Territory to RV, Automotive, entertainment coach, OEM, mass merchant, dealers, and not to exclude any additional pre-approved

accounts, a Commission . . . based on percentage of dealer/account sales." (Agreement Doc. # 32-2 at 3). The Agreement additionally provided that "[t]he Commission will be considered earned when [KVH] receives the Technical Training Report upon completion by the end of each month," and that "[t]he Commission will be paid to [Peeler] by the 20th of each month for the most recently ended month." (Id.). In conjunction with these obligations, the Agreement required KVH to send to Peeler, "[o]n or before the 15th of each month, . . . a statement of account showing the quantity of trainings completed by Peeler . . . during the month most recently ended and the amount of commission due . . . thereon." (Id.).

From January 2003 to March 2004, KVH paid Peeler $135,827.95 in training commissions. (Payment Invoice Doc. # 32-4 at 2). In April of 2004, Peeler and KVH agreed to a different payment arrangement, a Contractor Outline, in accordance with which Peeler received a consistent monthly salary of $5,500 per month plus expenses. (Contractor Outline Doc. # 32-5 at 2; Peeler Dep. Doc. # 30-2 at 12). The parties dispute the reason for the revised payment arrangement. According to KVH, the "reason for the new agreement was [Peeler's] displeasure with the previous

agreement, which did not include reimbursement of any form for the expenses incurred . . . in connection with [Peeler's] services rendered to KVH." (Mar. 30, 2005 Letter Doc. # 32-9 at 2). Peeler, however, contends that he "was okay with the way things were," and that he had not expressed concerns prior to 2004 about the way he received payment from KVH. (Peeler Dep. Doc. # 30-2 at 12).

KVH released Peeler as an independent contractor in February of 2005. (Id. at 25). Peeler testifies that, sometime in 2005 after his termination from KVH, a KVH sales representative named Scott Czewski provided him with certain "final reports" containing KVH's internal sales information, referred to as BAAN reports. (Id. at 4; Peeler Dep. Doc. # 30-1 at 8-10). Based on the details from those reports, Peeler became concerned that KVH had not paid him the total amount of commissions to which he was entitled under the Agreement. (Peeler Dep. Doc. # 30-2 at 4). Accordingly, on March 13, 2005, Peeler wrote a letter to Ian Palmer, KVH's Executive Vice President of Satellite Sales, explaining that KVH owed Peeler "$124,634.03 in unpaid commissions." (Id.; Mar. 13, 2005 Letter Doc. # 32-8 at 2). Palmer responded on March 30,

2005, with a letter denying Peeler's request for additional payment.  (Mar. 30, 2005 Letter Doc. # 32-9 at 2).

On April 4, 2005, Peeler sent Palmer a letter explaining that, since he never signed the Contractor Outline, the Outline did not effectively amend the original Agreement between the parties.  (Apr. 4, 2005 Letter Doc. # 32-10 at 2).  Peeler further demanded "the back-commissions that [were] contractually and rightfully due [him] for the 2003-2005 time period."  (Id.).[1]  In a written response dated June 10, 2005, Palmer explained to Peeler: "Your desire to invoke the benefits of both [the] January 2003 agreement and the Contractor Outline is entirely inappropriate."  (June 10, 2005 Letter Doc. # 32-11 at 2). Palmer further asserted that Peeler's "actions in accepting the $5,500 per month in compensation" reflect Peeler's "reliance on and acceptance of the terms of that document." (Id.).  Despite his position that the Contractor Outline defined KVH's relationship with Peeler, Palmer offered: "if you provide us with a copy of the fully executed January

---

[1] As of the time of Peeler's deposition, however, he claims to be entitled only to commissions earned through March of 2004, before the effective date of the Contractor Outline. (Peeler Dep. Doc. # 30-2 at 16-17).  Thus, Peeler's correspondence with Palmer in 2005 reflects a different basis for dispute than Peeler's current claim for damages based on the sales figures revealed by the BAAN software.

2003 agreement, as well as any other documents upon which you rely, we will nonetheless further evaluate your claim." (Id. at 3).  Peeler declined to do so. (Peeler Dep. Doc. # 30-2 at 19).

Nearly one year later, on May 5, 2006, an attorney named Stephen Morrissey contacted Eric Rudolph, KVH's corporate counsel, on behalf of Peeler, Czewski, and Dan Adams, another KVH salesman.  (May 5, 2006 Letter Doc. # 32-12 at 2).  The letter from Morrissey to Rudolph listed each client's total demand of back commissions based on the sales figures in the BAAN software, and requested access to the software itself, reasoning that "it is clear that the only real way to rectify the difference of opinion between the claimants and KVH is for each side to be analyzing from the same master set of sales and deliveries documentation." (Id.).   On  June  16,  2006,  Rudolph  responded  that Morrissey's "understanding that KVH's BAAN software could provide all the necessary information to resolve these disputes is simply, and unfortunately, incorrect."  (June 16, 2006 Letter Doc. # 32-13 at 2).  The letter proceeded to explain the detailed process by which the volume of KVH products sold by the individual retail stores of KVH's "national  account  customers"  is  reported  to  KVH  and

recorded for purposes of paying commissions to KVH's sales representatives. (Id.). Specifically, Rudolph explained that the "sales reports provided to KVH by these national customers are not . . . at any time resident in BAAN, but rather are in the form of Excel spreadsheets." (Id.).

After receiving Rudolph's response in June of 2006, Peeler did not file a lawsuit. (Peeler Dep. Doc. # 30-2 at 21). Indeed, Peeler claims to have had no further contact with KVH until 2011, when his current counsel contacted KVH demanding $447,731.94 in unpaid commissions. (Id.; Jan. 17, 2011 Letter Doc. # 32-14).

On April 12, 2012, Peeler filed the instant breach-of-contract action against KVH, claiming that "KVH breached the [Agreement] by failing to (a) pay Peeler all commissions due Peeler under the Agreement and (b) render Peeler with a statement of accounting showing the quantity of training completed by Peeler in the preceding month." (Doc. # 2 at ¶ 19). The Complaint asserts that Peeler's unpaid commissions amount to $447,731.94, and that Peeler is additionally entitled to "prejudgment interest at the proper legal rate pursuant to R.I. General Laws sec. 9-21-10." (Id. at ¶¶ 20, 23). On June 6, 2013, KVH filed a Motion for Summary Judgment (Doc. # 29), to which Peeler

responded in opposition on June 20, 2013 (Doc. # 37). KVH filed a reply on July 5, 2013. (Doc. # 47). On June 7, 2013, Peeler filed a Motion for Summary Judgment (Doc. # 34) as well as a Motion for Adverse Inference (Doc. # 33). KVH filed a response in opposition to both Motions (Doc. ## 38, 39) on June 24, 2013. Peeler filed a reply to KVH's response to the Motion for Summary Judgment on July 5, 2013. (Doc. # 46). Peeler additionally filed a Motion to Strike (Doc. # 36) on June 20, 2013, to which KVH responded (Doc. # 41) on June 25, 2013. The Court has carefully reviewed the Motions, the responses, the applicable replies, and is otherwise fully advised in the premises.

## II.   **Motion for Adverse Inference**

In his Motion for Adverse Inference, Peeler moves "for an Order imposing an adverse inference against Defendant [KVH] with respect to the fact that KVH cannot produce the following documents: (a) technical training reports submitted by Peeler; (b) purported sales reports from KVH's dealers and distributors; [and] (c) statements of account required to be submitted by KVH to Peeler." (Doc. # 33 at 1).[2]   Peeler argues that, because KVH is unable to produce

---

[2]   KVH clarifies in response to the Motion for Adverse Inference that, "[w]hile Plaintiff's motion does not

these documents, Peeler is entitled to adverse inferences that "(i) under the Manufacturer's Representative Agreement, Peeler's commissions should have been calculated based upon sales by KVH to its dealers direct and customer accounts/distributors and not based upon the sales of KVH's distributors/dealers downstream, (ii) Peeler provided technical training on behalf of KVH during the period [from] January 1, 2003, through March 31, 2004, to: Camping World, Stag Parkway, RiverPark, Keller Marine & RV, Perfect 10 Satellite Distribution, Sierra Select Distribution, Salem Distribution, Northern Wholesale, Bell Industries, and Arrow Distribution, and (iii) Peeler provided KVH with technical training reports evidencing those trainings." (Id. at 1-2).

Peeler argues that this Court should apply Rhode Island state law in determining whether KVH's actions constitute sanctionable spoliation warranting an adverse inference because the Agreement provides that "[t]he validity, interpretation, and performance of this Agreement

specify, KVH assumes that Peeler prematurely requests an adverse inference at the trial of this action."  (Doc. # 39 at 1).  As explained in further detail below, the Court finds that no adverse inference is warranted on the bases supplied in this Motion regardless of whether Peeler intended the inference to apply at the summary judgment or the trial stage of this litigation.

shall be controlled by and construed under the laws of the State of Rhode Island." (Doc. # 33 at 8-9; Agreement Doc. # 32-2 at 6). The Court disagrees with this premise. "In a diversity action such as the instant case, federal law governs the imposition of spoliation sanctions." Managed Care Solutions, Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010) (citing Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) ("[W]e conclude that federal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit.")). However, "the Court may look to state law for guidance to the extent that it is consistent with federal law." Id. (internal quotations omitted).

"Spoliation is the intentional destruction, mutilation, alteration, or concealment of evidence." Floeter v. City of Orlando, No. 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *5 (M.D. Fla. Feb. 9, 2007) (internal quotations omitted). The decision whether to impose spoliation sanctions is committed to the discretion of the Court. See United States v. Lanzon, 639 F.3d 1293, 1302 (11th Cir. 2011). "Generally, spoliation is established when the party seeking sanctions proves (1) that the missing evidence existed at one time; (2) that the alleged

10

spoliator had a duty to preserve the evidence; and (3) that the evidence was crucial to the movant being able to prove its prima facie case or defense." Floeter, 2007 WL 486633, at *5.

"Additionally, in this circuit sanctions for spoliation of evidence are appropriate 'only when the absence of that evidence is predicated on bad faith . . . . Mere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case.'" Id. (quoting Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997)). Thus, under the "adverse inference rule," the Court will not infer that the missing documents contained evidence unfavorable to KVH unless the circumstances surrounding the documents' absence "indicate bad faith, e.g., that [KVH] tampered with the evidence." Bashir, 119 F.3d at 931. See also Vick v. Tex. Emplm't Comm'n, 514 F.2d 734, 737 (5th Cir. 1975) (finding no adverse inference was warranted where "records were destroyed under routine procedures without bad faith and well in advance of [appellant's] service of interrogatories").

In the instant case, KVH argues that "some of the documents Peeler claims were destroyed never existed in the

first place." (Doc. # 39 at 3). Specifically, KVH notes that, although Peeler never asked KVH for a "statement of account" during his employment or complained that such statements were not being provided to him, Peeler now claims never to have received any such statements. (Id.). KVH further argues that

> it is wholly unclear that the "statement of account" referenced in the Agreement and which Peeler claims were (sic) never provided to him are truly "missing," as Peeler suggests. It is undisputed that Peeler did receive commission invoices with each and every one of his checks and that those invoices detailed the amount of commissions due to him based on the training he completed. . . . That is precisely the purpose that the "statement of account" served per the Agreement, yet Peeler admitted he never looked at these invoices during his employment. Peeler does not properly articulate what information he claims he should have received from these "statements of account," which was not provided to him in the "commission invoices."

(Id. at 4).

KVH similarly argues that, "other than Peeler's self-serving testimony," there is "no evidence . . . that [Peeler] provided training reports to KVH beyond the fifty or so that were produced in discovery." (Id. at 4; Training Forms Doc. # 34-10). Although Peeler claims to have produced several hundred additional reports to KVH, "Palmer testified that during 2003 and 2004, because

Peeler's training initiatives with Stag Parkway and Camping World were going so well, KVH relaxed the requirement that [Peeler] produce reports for those dealer/distributors." (Doc. # 39 at 5; Palmer Dep. Doc. # 31-1 at 11-12).  Thus, KVH argues, "Palmer's testimony confirms that Peeler cannot establish the first prong of his 'adverse inference' burden because documents that Peeler now claims KVH 'spoliated' likely did not exist in the first place." (Doc. # 39 at 5).

Furthermore, KVH denies that it had a "perpetual duty" to retain the relevant documents, "particularly because Peeler stopped communicating with KVH after June 2006." (Id.).  Peeler, however, maintains that "[a]n obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely." (Doc. # 33 at 10).  Peeler contends that "KVH was put on notice of Peeler's claim in 2005 and was threatened with litigation in 2005 and 2006," and thus had a duty to retain the documents "for the period of the ten year statute of limitations applicable to Peeler's breach of contract claim" notwithstanding the lapse between Peeler's 2006 letter and 2012 lawsuit.  (Id. at 11).[3]

---

[3] Peeler offers no legal authority to support his contention that the duty to retain documents endures for the duration

However, the prior existence of the documents and KVH's duty to retain them are not dispositive of the issue of spoliation because Peeler has failed to demonstrate bad faith -- that is, Peeler has not presented any evidence showing that KVH intentionally lost or destroyed the relevant documents. "Given [the Eleventh] Circuit's requirement that an adverse inference flowing from spoliation requires the presence of bad faith, even grossly negligent . . . conduct does not justify [an adverse inference]." Point Blank Solutions, Inc. v. Toyobo Am., Inc., No. 09-61166-CIV, 2011 WL 1456029, at *10 (S.D. Fla. Apr. 5, 2011). "In fact, district courts in our Circuit regularly deny adverse inference requests even when there is an indisputable destruction of evidence." Id.

Peeler appears to concede that there is no direct evidence of intentional spoliation, instead arguing in the Motion for Adverse Inference that "[t]here is *no credible explanation* for KVH's destruction of Peeler's technical training reports, statements of account, or the purported dealer/distributor sales reports *other than bad faith*." (Doc. # 33 at 12) (emphasis added). Peeler essentially

---

of the statute-of-limitations period related to a potential plaintiff's predicted cause of action.

argues that, because KVH was able to produce several other documents from the relevant time period, including Peeler's checks, emails from Peeler, and other employees' agreements from 2003 and 2004, the Court should infer bad faith because KVH cannot "credibly explain its lack of the most essential documents to Peeler's claim." (Id. at 13). The Court disagrees.

As this Court recognized in Sterbenz v. Anderson, No. 8:11-cv-1159-T-33TBM, 2013 WL 1278160, at *3 (M.D. Fla. Mar. 28, 2013), for a court to determine via circumstantial evidence that a party acted in bad faith in permitting evidence to be destroyed, the following criteria must be met:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in this case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

Id. (quoting Walter v. Carnival Corp., No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010)).

Just as the moving party in Sterbenz, Peeler has not satisfied the criteria for founding bad faith on

circumstantial evidence because Peeler has failed to establish that KVH engaged in any affirmative act causing the documents to be lost.  Palmer testified that "normal and customary activity within KVH is to retain and save documentation within a reasonable time frame" (Palmer Dep. Doc. # 31-2 at 24), and that "after the three rounds of letters [between Peeler and KVH] . . . I fully thought that was completely it, it was done, it was -- there was no possible way that Dave Peeler could have any reason for dispute." (Id. at 22).  Accordingly, although it may have been imprudent for KVH to dispose of the relevant documentation in light of Peeler's complaints, the Court cannot say that KVH's actions or inaction amounted to bad faith as required to impose an adverse inference spoliation sanction.

Although not determinative, the Court in arriving at this conclusion has considered Peeler's own failure to retain certain relevant documents despite being on notice of this litigation.  In response to questioning regarding his retention of documents relating to his independent contractor relationship with KVH, Peeler testified:

> Q: And you got rid of any of the other
>    financial documents because you felt
>    after seven years you were in the clear

from an IRS standpoint, correct?

A:   What financial documents are you referring
     to?

Q:   Taxes, credit cards, expense reports.
     Anything that you kept as part of your
     arrangement as an independent contractor,
     you don't have those anymore, do you?

A:   No, ma'am.

Q:   Because you felt you were in the clear with
     -- with the IRS?

A:   Yes, ma'am.

Q:   Even though you knew seven years ago that
     you had a claim against KVH, didn't you?

A:   Yes, ma'am.

Q:   You didn't keep any of the documents though,
     did you?

A:   No, ma'am.

(Peeler Dep. Doc. # 30-2 at 8).  As KVH argues in response

to the Motion for Adverse Inference, Peeler "bears some of

the blame" for the lack of documentation in this case.

(Doc. # 39 at 6).  "Even though he claims he continued to

contemplate litigation against KVH[,] Peeler conceded that

he personally destroyed or failed to retain his own

additional documentation" relating to his claims in this

case.  (Id.).  The training reports submitted by Peeler to

KVH could have been retained just as easily by Peeler as by

KVH; yet, Peeler attempts to fault KVH exclusively for their disappearance.

Additionally, Peeler provides no evidence to support his contention that a "statement of account," as provided in the Agreement, constitutes a document other than the commission invoices attached to Peeler's paychecks. According to KVH, "those invoices detailed the amount of commissions due to [Peeler] based on the training he completed" (Doc. # 39 at 4); Peeler admits that he "really didn't pay attention to" the "backup details" attached to his paychecks (Peeler Dep. Doc. # 30-2 at 4).

As for the "purported sales reports from KVH's dealers and distributors," Peeler has failed to demonstrate that KVH engaged in any affirmative act which caused these documents to be lost, nor has Peeler offered any other evidence of bad faith on KVH's behalf.

Accordingly, in the absence of bad faith, and in light of Peeler's failure to keep related documentation as well as Peeler's unusually lengthy delay in bringing this action, the Court finds that no adverse inference is warranted.

## III. **Motions for Summary Judgment**

### A. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,'

and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Empl'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

### B.    KVH's Motion for Summary Judgment

KVH makes clear in its Motion for Summary Judgment that, "[w]hile KVH vehemently disputes the method by which Peeler believes his commissions should have been calculated, KVH does not challenge the madness of that method in this Motion." (Doc. # 29 at 2). Instead, KVH confines its summary judgment arguments to issues of staleness, contending that Peeler "waited too long to bring his lawsuit and his breach of contract claim is time-barred under Florida law. Additionally, the doctrine of laches (in both Florida and Rhode Island), as well as equity and common sense, preclude Peeler's breach of contract claim from proceeding." (Id. at 2-3). The Court will address each of these arguments in turn.

## 1.   Admissibility of Supporting Documents

As a preliminary matter, the Court notes that Peeler challenges the Court's potential reliance upon several documents filed by KVH in support of its Motion for Summary Judgment. In his Motion to Strike these documents, Peeler contends that

> The following documents . . . cannot be used in support [of] a motion for summary judgment: Atlantic.net Subpoena Response dated 2/28/13, Camping World Subpoena Response dated 5/2/13, 2004 Contractor Outline, Peeler Damages Chart, FIA Card Service Subpoena Response dated 4/10/13, 1/31/05 J. Jones email to D. Peeler, River Park

Subpoena Response dated 4/22/13, and Stag Parkway
Subpoena Response dated 4/16/13.

(Doc. # 36 at 1).  Specifically, Peeler argues that "[t]he above-referenced documents are not included in Fed. R. Civ. P. 56 as permissible documents to be filed in support of a motion for summary judgment," and further contends that the documents constitute inadmissible hearsay to which no exception applies.  (Id. at 2).

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999) (internal quotations omitted).  However, the Eleventh Circuit has "restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" Id. (citations omitted).

The Advisory Committee Notes to Rule 56(c)(2) provide as follows: "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  The objection functions much as an objection at trial, adjusted for the pretrial setting.  *The burden is on*

*the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.*"   Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments) (emphasis added).

### a.   Subpoena Responses

Regarding the challenged subpoena responses, KVH argues that Peeler subpoenaed these records "from his internet provider, his credit card company and from various distributors of KVH seeking documents from the relevant time period," and that Peeler now "[c]uriously . . . pretends to disavow documents that he requested and which he repeatedly referenced in his own submissions to the Court."   (Doc. # 41 at 2).   KVH argues that "all the responses at issue are signed by agents of their respective organizations, in response to a legal subpoena, and have the requisite 'guarantees of trustworthiness' as required under Federal Rule of Evidence [807],"[4] and furthermore that these documents are "the best evidence as to what the[ ] distributors have (or do not have) concerning Peeler and

---

[4] KVH cites to non-existent Federal Rule of Evidence 809 in its response to Peeler's Motion to Strike.   The Court construes KVH's arguments, however, as an attempt to demonstrate admissibility under the hearsay residual exception, Rule 807.

sales of KVH products during [the relevant] time period."
(Id. at 2-3).

However, despite KVH's argument that these responses
are sufficiently trustworthy, the Court notes that
"Congress intended [Rule 807,] the residual hearsay
exception[,] to be used very rarely, and only in
exceptional circumstances." Jenks v. Naples Cmty. Hosp.,
Inc., 829 F. Supp. 2d 1235, 1248 (M.D. Fla. 2011). "[I]t
applies only when certain exceptional guarantees of
trustworthiness exist and when high degrees of
probativeness and necessity are present." Id. (internal
quotations omitted).

The Court finds that no high degree of necessity
exists in this case that would justify consideration of the
subpoena responses under the residual exception. It
appears to the Court that these unsworn statements could
easily have been reduced to an admissible form, as KVH does
not contend that any of the relevant declarants are
unavailable; nonetheless, as explained above, it is the
duty of the proponent to show that the material is
admissible as presented or to explain the admissible form
that is anticipated. Beyond (1) arguing that Rule 807
applies and (2) arguing, without offering supporting legal

authority, that "[i]n light of his own clear references to the[ ] subpoena responses and acknowledgement that none of the subpoenaed entities were able to provide documents, Peeler cannot now claim that those same subpoena responses should be stricken," KVH has offered no exception justifying admissibility of these responses over Peeler's hearsay objection.

KVH seeks to offer these responses for the truth of the matters they assert: namely, that the documents requested from the subject time period have been disposed of under record retention guidelines, or that they otherwise cannot be located due to the passage of time. Thus, the responses constitute hearsay statements, and KVH's arguments that they are each "signed by agents of their respective organizations in response to a legal subpoena" and that "they are the best evidence as to what these distributors have (or do not have) concerning Peeler" fail to demonstrate the applicability of Federal Rule of Evidence 807. Accordingly, the Court grants Peeler's Motion to Strike as to the subpoena responses.

      **b.**    **<u>Contractor Outline, Damages Chart, and Jones Email</u>**

Peeler additionally moves to strike as hearsay the 2004 Contractor Outline. (Contractor Outline Doc. # 32-5 at 2). However, KVH contends that the contract could be offered as admissible evidence at trial under Rule 803(5), the recorded recollection exception to the rule against hearsay. (Doc. # 41 at 4). The Court agrees; the document could indeed be reduced to admissible evidence at trial by reading the contract to the jury as a recorded recollection, provided a proper foundation exists. Thus, the Court denies Peeler's Motion to Strike as to the Contractor Outline.

Peeler also claims that his own damages calculation chart constitutes inadmissible hearsay. However, the Court finds that this document is not hearsay because it is not offered by KVH to prove the truth of the matter it asserts; that is, KVH does not offer the chart to prove that KVH owes Peeler total commissions plus interest amounting to $785,574.50. (Damages Chart Doc. # 32-1 at 2). Rather, KVH offers the chart to show that Peeler previously demanded that amount in the present breach-of-contract action. (Doc. # 29 at 2). Accordingly, the Court denies Peeler's Motion to Strike as to the damages chart.

Lastly, Peeler argues that an email he received from

Joel Jones, a KVH sales manager, in January of 2005 constitutes inadmissible hearsay and should not be considered in support of KVH's Motion for Summary Judgment. KVH responds that this document is offered merely to corroborate Peeler's testimony that KVH terminated his employment on February 1, 2005.  (Doc. # 41 at 4).  The Court has not relied on this email in resolving KVH's Motion for Summary Judgment; thus, Peeler's Motion to Strike is denied as moot as to the Jones email.

### 2.   Statute of Limitations

In its Motion for Summary Judgment, KVH argues that Peeler's breach-of-contract claim "is governed by Florida's statute of limitations -- not Rhode Island's -- and is, therefore, time-barred."  (Doc. # 29 at 16).  Under section 95.11(2)(b), Florida Statutes, "a legal or equitable action on a contract" must be commenced within five years. However, under section 9-1-13(a), Rhode Island General Laws, "civil actions shall be commenced within ten (10) years next after the cause of action shall accrue . . . ."

Jurisdiction in this case is founded upon diversity of citizenship.  "A court, sitting in diversity, is required to apply the choice of law rules of the state in which it sits." Pulte Home Corp., Inc. v. Ply Gem Indus., Inc., 804

F. Supp. 1471, 1478 (M.D. Fla. 1992).  "Under Florida law, courts will enforce 'choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.'" Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1341 (11th Cir. 2005) (quoting Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000)). "The countervailing public policy must be of sufficient importance and rise above the level of routine policy considerations to warrant invalidation of a party's choice to be bound by the substantive law of another state." S.E. Floating Docks, Inc. v. Auto-Owners Ins. Co., 82 So. 3d 73, 80 (Fla. 2012).  "[U]sury laws and statute[s] of limitations are not founded on such strong public policy." Walls v. Quick & Reilly, Inc., 824 So. 2d 1016, 1020 (Fla. 5th DCA 2002); see also Burroughs Corp. v. Suntogs of Miami, Inc., 472 So. 2d 1166, 1169 (Fla. 1985) (finding that a contractual limitations clause which shortened the time period for bringing a suit was not contrary to a strong public policy).

"[F]our factors . . . indicate whether the countervailing policy overrides the expectations of contracting parties: whether the statute evincing the policy is fraught with exceptions; whether the statute is

frequently amended, thereby reflecting a flexible public policy; whether the policy is fundamental to the legal system; and whether the outcome has a limited effect upon the contract." Mazzoni Farms, 761 So. 2d at 311.

In analyzing another Florida Statute, section 95.03,[5] Burroughs Corp. v. Suntogs of Miami, 472 So. 2d at 1168, provides a persuasive analysis of these factors in the context of statutes of limitations generally. The Court reasoned (1) "the legislature has frequently amended the provisions controlling the statutory periods of limitation, demonstrating the flexibility of this public policy"; (2) "we do not consider the protections offered by a statute of limitations to be fundamental to a legal system"; and (3) "the laws governing the time to bring a suit have a limited effect upon a contract insofar as they do not invalidate the contract, but merely allow the defendant to set up an affirmative defense." Id. Consistent with these principles, a contract's choice-of-law provision, as it affects the applicable statute of limitations, does not rise above the level of routine policy considerations as

---

[5] "Any provision in a contract fixing the period of time within which an action arising out of the contract may be begun at a time less than that provided by the applicable statute of limitations is void." Fla. Stat. § 95.03.

required to warrant invalidation of the parties' choice to be bound by the substantive law of another state.

"[P]arties that enter into commercial contracts reasonably expect choice-of-law provisions to be valid and enforceable, and to disregard a choice-of-law provision in a commercial transaction would destabilize an area of law relied upon for its predictable and uniform application." Floating Docks, 82 So. 3d at 81 (citing Precision Tune Auto Care, Inc. v. Radcliffe, 815 So. 2d 708, 711 (Fla. 4th DCA 2002)). The Court accordingly finds that the choice-of-law provision in this case does not seek to apply the law of a forum which contravenes strong public policy. Therefore, the Court finds that Rhode Island law governs this dispute, as provided in the Agreement, and that, in accordance with Rhode Island General Laws section 9-1-13(a), Peeler's breach-of-contract claim is timely.

In so finding, the Court is mindful of KVH's argument that the choice-of-law provision in the relevant Agreement, which states: "The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the state of Rhode Island," (Agreement Doc. # 32-2 at 6), is "silent as to the time in which challenges to the Agreement may be brought by either

party." (Doc. # 29 at 17). KVH additionally argues that "[n]otably absent from this paragraph is the more traditional contract language that the entire document or agreement is subject to the laws of a particular state." (Id.). KVH apparently raises these arguments in an effort to avoid the presumptive validity of the choice-of-law provision under Florida law. See Mazzoni, 761 So. 2d at 311.

KVH does not offer any legal support for its apparent contention that specific language is required to trigger the effectiveness of a choice-of-law provision regarding the chosen forum's statute of limitations, and the Court declines to impose such a requirement. A court in the Southern District of Florida rejected a similar argument in Gaisser v. Portfolio Recovery Associates, LLC, 571 F. Supp. 2d 1273, 1276 (S.D. Fla. 2008). In that case, the court noted that, "[w]hile there is authority [from other jurisdictions] supporting the proposition that a choice of law provision of a contract must explicitly incorporate the statute of limitations of the chosen forum in order for that forum's statute to apply, such authority is not controlling or binding here." (citing F.D.I.C. v. Petersen, 770 F.2d 141, 142 (10th Cir. 1985) (explaining

that statutes of limitation are considered to be procedural rather than substantive law, and therefore they are generally not incorporated into choice-of-law provisions)). In Florida, "statutes of limitation are considered substantive in nature," and "a choice of law provision functions to supply a rule of decision for the substantive rights of the parties." W. Grp. Nurseries, Inc. v. Ergas, 211 F. Supp. 2d 1362, 1366 (S.D. Fla. 2002).

Accordingly, absent any authority relating to the alleged requirement that a choice-of-law provision specify its application to the "entire document or agreement," as KVH proposes, the Court finds that, under Florida choice-of-law rules, the choice-of-law provision in the present Agreement provides for the application of Rhode Island law, including that state's statute of limitations, to the instant breach-of-contract dispute. Thus, the Court determines that Peeler's action is not time-barred by the applicable statute of limitations.

### 3. **Laches**

"Laches is an equitable defense that precludes a lawsuit by a plaintiff who has negligently sat on his or her rights to the detriment of a defendant." Hazard v. E. Hills, Inc., 45 A.3d 1262, 1269 (R.I. 2012) (internal

quotations omitted).   Peeler argues in response to KVH's Motion for Summary Judgment that, under Rhode Island law, "the defense of laches is peculiar to courts of equity and does not apply in actions at law."   (Doc. # 37 at 11) (citing Grand d'Hauteville v. Montgomery, 169 A.2d 916, 918 (R.I. 1961)).   KVH counters, however, that according to the Rhode Island Supreme Court, "although the concept of laches originated in courts of chancery, it is today often employed in situations in which the relief sought is not readily classifiable as equitable in nature."   (Doc. # 47 at 4) (quoting Raso v. Wall, 884 A.2d 391, 394 (R.I. 2005)).

This Court need not determine, however, whether the Rhode Island Supreme Court would apply the doctrine of laches to a breach of contract action initiated before the statutory limitations period had lapsed, because the Court finds that, even if laches were an appropriate defense to Peeler's claim, the defense would not apply under the circumstances of this case.

Under Rhode Island law, a trial court confronted with the defense of laches must apply a two-part test: "First, there must be negligence on the part of the plaintiff that leads to a delay in the prosecution of the case.   Second,

33

this delay must prejudice the defendant."   Hazard, 45 A.3d at 1270.   "'There is no hard and fast rule for determining what constitutes sufficient prejudice to invoke the doctrine of laches.'"   Id. at 1271 (quoting Fitzgerald v. O'Connell, 120 R.I. 240, 249 (R.I. 1978)).   "Laches bars a stale cause of action when an unexplained or unjustified delay in asserting the claim is 'of such great length as to render it difficult or impossible for the court to ascertain the truth of the matters in controversy and do justice between the parties.'"   Id. (quoting Fitzgerald, 120 R.I. at 246).

In Hazard v. East Hills, Inc., 45 A.3d at 1271, the Supreme Court of Rhode Island explained that "it [is] incumbent upon [the] plaintiff to come forth with a fair explanation of the reason for the delay."   In this case, Peeler provides the following explanation for his delay in bringing this lawsuit:

> Between 2006 and 2010, Peeler was unable to find an attorney that would follow through on filing an action against KVH. . . . After 2006, Peeler met with at least three other attorneys, two in Florida and one in Rhode Island, in an attempt to retain them to bring an action against KVH. . . . In 2008 to 2009, Peeler was involved in a foreclosure action and was forced to move out of his home and move in with his mother-in-law. . . . Between 2008 and 2010, Peeler was also involved in a lawsuit wherein his partners in a flower

> shop business sued him and his wife. . . .
> Finally, in 2010, Peeler was able to retain legal
> counsel to litigate KVH's underpayment of
> commissions due him under the Agreement.

(Doc. # 37 at 4-5).

The Court acknowledges, as do the parties in the instant case, that many of the preferred sources of evidence that might once have assisted in ascertaining the truth of the matters in controversy are now unavailable due to the passage of time. However, the Court does not find that the staleness of this case is such that the Court should preclude this matter from proceeding toward a resolution on the merits.

As explained above, Rhode Island law requires both negligence on the part of the plaintiff and prejudice to the defendant as prerequisites to applying laches. In evaluating a plaintiff's negligence, a court must consider whether the plaintiff's delay in asserting a claim is unexplained or unjustified. Hazard, 45 A.3d at 1271. While Peeler's delay in initiating this action was certainly lengthy, it is not without explanation. The Court finds Peeler's delay, occasioned partly by personal financial difficulties, excusable for purposes of KVH's Motion for Summary Judgment. See Andrukiewicz v.

Andrukiewicz, 860 A.2d 235, 241 (R.I. 2004) (recognizing the plaintiff's delay in bringing suit as excusable "based upon her testimony that she spent all her available funds on tuition and could not afford an attorney"); Goff v. U.S. Fid. & Guar. Co., 72 R.I. 363, 371 (1947) ("[It] has been held that any excuse for delay, which excuse takes hold of the conscience of the chancellor and makes it inequitable to interpose the bar of laches, is sufficient.").

With regard to the extent of prejudice suffered by KVH due to the time lapse in this case, the Court notes that Peeler has been prejudiced likewise; this is not a case involving a plaintiff who stockpiled relevant documents before lying in wait only to ambush the defendant after some predictable destruction of more favorable evidence had occurred. As discussed in reference to Peeler's Motion for Adverse Inference, for instance, Peeler lacks documentation -- once admittedly in his possession -- to demonstrate the amount of training he completed for KVH. The amount of training performed by Peeler constitutes a central dispute of material fact in this case and, as the plaintiff in this matter, Peeler bears the ultimate burden of proving the amount of damages to which he claims he is entitled. Peeler will continue to bear that burden with the added

challenge of utilizing decade-old evidence.

The Court accordingly declines to find that laches bars Peeler's breach-of-contract claim.  Because the Court has also determined that Rhode Island's statute of limitations applies to Peeler's claim, KVH's Motion for Summary Judgment is denied.

**C.  <u>Peeler's Motion for Summary Judgment</u>**

Peeler argues that summary judgment is appropriate on his breach-of-contract claim because the term "dealer/account sales," as provided in the Agreement, is not ambiguous, and because KVH failed to pay Peeler a commission on all sales of KVH products from KVH to its dealers and other customer accounts.  (Doc. # 34 at 6). "To succeed on a breach of contract claim under Rhode Island law, a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." <u>Barkan v. Dunkin' Donuts, Inc</u>., 627 F.3d 34, 39 (1st Cir. 2010).  As explained below, the Court finds that the Agreement between KVH and Peeler is ambiguous and therefore denies Peeler's Motion for Summary Judgment.

**1.  <u>Ambiguity of Contract Language</u>**

"Determining whether a contract is ambiguous is a

question of law for the Court." Dan Cake (Portugal) S.A.
v. CVS Pharmacy, Inc., 862 F. Supp. 2d 120, 124 (D.R.I.
2012). "A contract is ambiguous only when it is reasonably
and clearly susceptible of more than one interpretation."
Id. (quoting Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I.
1996)). "If the terms are found to be unambiguous, . . .
the task of judicial construction is at an end and the
parties are bound by the plain and ordinary meaning of the
terms of the contract." Id. (quoting Zarella v. Minn. Mut.
Life Ins. Co., 824 A.2d 1249, 1259 (R.I. 2003)). "Whereas
the construction of a clear and unambiguous contract
presents an issue of law which may be resolved by summary
judgment, an ambiguous contract may not properly be
resolved on summary judgment." Lennon v. MacGregor, 423
A.2d 820, 822 (R.I. 1980).

In the present case, the Agreement provides, in
relevant part:

> A. Commissions. [KVH] shall pay [Peeler] on all
> technical training performed in the Territory to
> RV, Automotive, entertainment coach, OEM, mass
> merchant, dealers, and not to exclude any
> additional pre-approved accounts, a commission
> ("Commission") as shown in Exhibit B, and will be
> (sic) based on *percentage of dealer/account
> sales*. A commission will be paid on all accounts
> trained for the region listed in Exhibit B. The
> Commission will be considered earned when
> Principal receives the Technical Training Report

upon completion by the end of each month. A
report that supports trade show or other sales
activities by the agent may also be used to have
the commission considered earned upon "like"
completions. The Commission will be paid to the
Agent by the 20th of each month for the most
recently ended month.

(Agreement Doc. # 32-2 at 3) (emphasis added).

According to Peeler, "dealer/account sales" is an
unambiguous phrase meaning "sales from KVH to its customer
accounts and dealers direct." (Doc. # 34 at 7). Peeler
further argues that this meaning "is easily apparent" upon
examination of Exhibit B, to which the above provision
refers. Exhibit B provides:

Commission

The following is a listing of the sales
channels of [KVH] with the appropriate commission
to be paid to [Peeler] as outlined in Section IV,
Compensation.

| Sales Channel | Commission Rate per Training |
|---|---|
| Land Mobile Products - Dealers Direct | .05% |
| Distributor | 3.5% |
| Camping World | 1% |

(Agreement Doc. # 32-2 at 7). Peeler argues that "the
plain and ordinary meaning of the term 'sales channels of
[KVH]' could not mean anything other than sales by KVH to

its distribution channels -- dealers direct and other customer accounts, such as Camping World and other distributors." (Doc. # 34 at 7-8).

The Court disagrees. Although ambiguity is not created merely because the litigants disagree about the meaning of a contract, the current dispute illustrates the Agreement's ambiguity convincingly. While Peeler maintains that the relevant language references sales by KVH to dealers and other customer accounts, KVH contends that it intended the phrase "Dealer/Account Sales" to mean the "sell through" activity from KVH's dealers and distributors to their customers or end users. (Doc. # 38 at 6; Doc. # 29 at 5-6). The Agreement contains no definition of the term "dealer/account sales," and the term is not used elsewhere in the Agreement. After reviewing the contract language in its entirety, the Court finds that the term "dealer/account sales" is reasonably susceptible to more than one meaning, and that it is therefore ambiguous.

Having determined that this integral contract term is ambiguous, the Court declines to consider the extrinsic evidence offered by both parties that could be considered in resolving the ambiguity. This principle was recently recognized by the Rhode Island Supreme Court in <u>Inland</u>

American Retail Management LLC v. Cinemaworld of Florida, Inc., No. 2012-151-Appeal, 2013 WL 3020002, *5 (R.I. June 18, 2013).   In that case, the Rhode Island Supreme Court explained:

> Because the term "real estate taxes" as used in the lease is neither defined within the document, nor specifically governed by the statute, we are satisfied that the term is ambiguous and reasonably susceptible to more than one interpretation.   Thus, although contract interpretation is a question of law, when the contract terms are ambiguous, interpretation of the terms becomes a question of fact. Accordingly, at this stage of the proceedings -- interpreting ambiguous contractual language -- statutes and common-law principles should be considered as only part of the surrounding circumstances from which to discern the intent of the parties.   A resort to such outside sources is not permitted to aid or explain the intended meaning of the parties, unless and until the contract language is found to be ambiguous. However, in this case, because we conclude that the language of the lease is ambiguous, we agree with [appellant] that [the relevant statute] is certainly one of several pieces of extrinsic evidence that should be considered to resolve the ambiguity.   Nonetheless, it is not appropriate to consider this evidence on a motion for summary judgment because the intent of the parties is a question of fact.

Id. at *5-6 (internal citations omitted).   Thus, at this juncture the Court declines to determine the intent of the parties and correspondingly declines to determine whether KVH has breached its Agreement with Peeler; instead, in light of the determination that a genuine issue of material

41

fact exists in the instant case, the Court denies Peeler's Motion for Summary Judgment.[6]

## 2. Commission Discrepancy -- 2.5%

The parties do not dispute that, in at least three instances memorialized in Commission Invoices dated April 14, 2003, and July 11, 2003, KVH paid Peeler 2.5% rather than 3.5% on certain dealer account sales. (Invoice Doc. # 32-3 at 9, 13, 17; Doc. # 34 at 11; Doc. # 38 at 11). Peeler testified that he did not notice this discrepancy until 2012, after initiating the present action. (Peeler Dep. Doc. # 30-2 at 9). KVH argues that, because Peeler received the relevant Commission Invoices which "on their face evidence the fact that [Peeler] was paid a 2.5% commission on certain dealer account sales," and cashed the corresponding commission checks without question, Peeler has thus waived his claim for the additional 1% under Rhode Island law.

"Waiver is the voluntary, intentional relinquishment of a known right. It results from action or nonaction." Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.,

---

[6] Correspondingly, the Court declines to examine the hotly-disputed issue of the number of trainings that Peeler actually completed during the relevant time period. As previously explained, such a disputed factual issue cannot properly be resolved by the Court at this juncture.

890 A.2d 58, 65 (R.I. 2005) (citations omitted).  "The party claiming that there has been a waiver of a contractual provision has the burden of proof on that issue." Id.  "A waiver may be proved indirectly by facts and circumstances from which intention to waive may be clearly inferred." Id.  "On summary judgment, the party asserting waiver of a contract term has the affirmative duty to produce evidence demonstrating the existence of an issue of fact concerning the voluntary relinquishment of a known right." Id.

"Further, implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver." Id. (internal quotation and citation omitted).  "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." Id.

In this case, KVH has provided evidence demonstrating that (1) Peeler knew of his contractual right to receive a 3.5% commission rate for distributor sales (Agreement Doc. # 32-2 at 7), (2) Peeler was provided Commission Invoices

43

contemporaneously with his paychecks which clearly provided for only 2.5% commission on certain account sales (Invoice Doc. # 32-3 at 9, 13, 17), and (3) Peeler admittedly did not notice, let alone complain of, this discrepancy until 2012 -- nine years after he cashed the checks providing for only 2.5% commission (Peeler Dep. Doc. # 30-2 at 9). Accordingly, KVH has presented evidence demonstrating the existence of an issue of fact concerning Peeler's voluntary relinquishment of a known right; this evidence is sufficient to preclude granting Peeler's Motion for Summary Judgment as to the issue of the 1% commission discrepancy. Sturbridge, 890 A.2d at 65; see also Haxton's of Riverside, Inc. v. Windmill Realty, Inc., 488 A.2d 723, 725-26 (R.I. 1985) ("A party's actions can resolve the question of whether he or she has knowledge of the right waived and whether the waiver was voluntary. As a general rule, the question of whether a party has voluntarily relinquished a known right is one of fact for a jury.").

### 3.   **Statement of Account**

Similar to KVH's response to Peeler's argument regarding the 1% discrepancy, KVH maintains that Peeler's conduct in cashing his paychecks without receiving or demanding to receive a "statement of account" constitutes

waiver of that contractual right as well.  However, with regard to this alleged contractual breach, the Court finds a waiver analysis to be unnecessary.

To the extent Peeler seeks summary judgment based on KVH's failure to provide Peeler with a monthly statement of account, (Agreement Doc. # 32-2 at 3), the Court finds that a genuine issue of material fact exists as to whether the "backup details" attached to Peeler's paychecks and admittedly ignored by Peeler (Peeler Dep. Doc. # 30-2 at 4, 9; Invoice Doc. # 32-3) fulfilled this requirement under the Agreement.  In light of this factual dispute, the Court denies Peeler's Motion for Summary Judgment as to this issue.

### 4.   <u>Statutory Interest</u>

In his Motion for Summary Judgment, Peeler asserts his entitlement "to prejudgment interest on his damage award from the date of the breach by KVH" in accordance with Rhode Island General Laws § 9-21-10.  (Doc. # 34 at 15). That statute provides, in relevant part:

> (a) In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at a rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein.

> Post-judgment interest shall be calculated at the
> rate of twelve percent (12%) per annum and accrue
> on both the principal amount of the judgment and
> the prejudgment interest entered therein.  This
> section shall not apply until entry of judgment
> or to any contractual obligation where interest
> is already provided.

R.I. Gen. Laws § 9-21-10.  The Court finds that an award of
interest to Peeler under this statute would be
inappropriate.

"Statutes that award prejudgment interest generally
serve the dual purposes of encouraging the early settlement
of claims . . . and compensating plaintiffs for waiting for
recompense to which they were legally entitled."  Martin v.
Lumbermen's Mut. Cas. Co., 559 A.2d 1028, 1031 (R.I. 1989)
(citations omitted).  The award of interest in this case
would promote neither purpose.

At least once, in response to Peeler's demands in
April of 2005, KVH offered "to further evaluate [Peeler's]
claim," provided Peeler would furnish KVH with "a copy of
the fully executed January 2003 agreement, as well as any
other documents upon which [he] rel[ied]."  (June 10, 2005
Letter Doc. # 32-11 at 3).  Peeler, apparently not
interested in pursuing KVH's offer to further evaluate his
claim at that time, declined to provide the requested
documents.  (Peeler Dep. Doc. # 30-2 at 19).  Thus, the

Court finds that awarding prejudgment interest to Peeler would not promote the statutory objective of encouraging early settlement.  Furthermore, much -- if not all -- of Peeler's "waiting" regarding his claims in this matter can be attributed to his own delay in filing this action.  The Court accordingly finds no cause to award prejudgment interest in this case.  See Martin, 559 A.2d at 1031 (declining to award interest under section 9-21-10 where an award "would promote neither of the purposes" of the statute).

### 5. **Attorney's Fees**

Peeler claims to be entitled to attorney's fees pursuant to section 9-1-45, Rhode Island General Laws. (Doc. # 34 at 16).  That statute provides as follows:

> The Court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court:
>
> (1) Finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party; or
>
> (2) Renders a default judgment against the losing party.

As Peeler is not a prevailing party with regard to his Motion for Summary Judgment, the Court finds that he is not entitled to statutory attorney's fees at this juncture.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) KVH Industries, Inc.'s Dispositive Motion for Summary Judgment (Doc. # 29) is **DENIED.**

(2) Plaintiff David Peeler's Motion for Adverse Inference (Doc. # 33) is **DENIED.**

(3) Plaintiff David Peeler's Motion for Summary Judgment (Doc. # 34) is **DENIED.**

(4) Plaintiff David Peeler's Motion to Strike Defendant's Documents filed in Support of Motion for Summary Judgment is **GRANTED** to the extent that the Court strikes the relevant subpoena responses as detailed herein; the Motion is otherwise **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 25th day of July, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record